UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 25-20127-CR-CMA

UNITED STATES OF AMERICA,

vs.

PABLO SILVERIO REBOLLIDO,

    Defendant.
_____/

### UNITED STATES OF AMERICA'S SENTENCING MEMORANDUM

The United States of America respectfully submits this sentencing memorandum for the Court's consideration and responds to Defendant's Sentencing Memorandum and Request for Downward Variance and/or Departure ([ECF No. 34]).

Pablo Silverio Rebollido spearheaded a bold and brazen *Ponzi* scheme, through which he defrauded over 60 victims of approximately $36 million, never actually operating the merchant cash advance business that he advertised to them. While Rebollido had over 60 investors, he had no actual merchant cash advance clients, and his businesses generated no revenue. As a result, Rebollido operated a textbook *Ponzi* scheme, using new investor funds to make "returns" to earlier investors to keep up the appearance of profitability. Even more egregious than that, is how Rebollido used the stolen funds, spending the money on his lavish lifestyle in a manner that can only be described as befitting the most egregious of fraudsters. Rebollido purchased purses, clothes, jewelry, cars, a driver, boats, land, homes and adult entertainment services. Rebollido continued his fraud scheme for over five years, during which time he watched friends, family, and their extended networks go into debt, leverage their life savings, and take on extra jobs to invest in what he falsely portrayed as a thriving and secure enterprise, all while knowing the business was entirely fictitious.

1

Based on the Defendant's above detailed conduct, this Court should deny the Defendant's request for a variance and/or downward departure and sentence Defendant Pablo Silverio Rebollido to 200 months' imprisonment to punish him for his significant criminal misconduct, to protect the public from further crimes and deter others from committing similar economic crimes.

## SENTENCING PRINCIPLES

## 18 U.S.C. § 3553(a)

After *United States v. Booker*, 543 U.S. 220 (2005), a sentencing court need only consider the factors in 18 U.S.C. § 3553(a) and determine a reasonable sentence. *United States v. Talley*, 431 F.3d 784, 786 (11th Cir. 2005). We address the relevant factors below. While the Court must consider all the relevant factors, it "need only acknowledge that it considered [them], and need not discuss each of these factors in either the sentencing hearing or in the sentencing order." *United States v. Amedeo*, 487 F.3d 823, 833 (11th Cir. 2007). The Court may give greater weight to some factors than others. *See United States v. Shaw*, 560 F.3d 1230, 1238 (11th Cir. 2009).

The Court may also consider requests for variances and departures. The Supreme Court has held that variances from the advisory guideline range may, in some instances, be based on the sentencing judge's disagreement with whether a guideline properly reflects the § 3553(a) factors. *United States v. Rosales-Bruno*, 789 F.3d 1249, 1254 (11th Cir. 2015) (citing *Kimbrough v. United States*, 552 U.S. 85, 105–09 (2007)).

U.S.S.G. §§ 5K2.0–5K2.24 outline various bases for departure from the sentencing guidelines, including factors that are prohibited, encouraged, discouraged, or unaddressed. In determining whether a departure is warranted, a district court must first assess whether the requested basis is prohibited, encouraged, discouraged, or unaddressed by the Guidelines as a

2

potential ground for departure. *United States v. Kim*, 364 F.3d 1235, 1240 (11th Cir. 2004) (citing *United States v. Hoffer*, 129 F.3d 1196, 1200 (11th Cir. 1997)).

Courts may never depart based on prohibited factors. *Koon v. United States*, 518 U.S. 81, 95–96 (1996). Departures based on discouraged factors are permissible only in rare cases—specifically, where the factor is present to an exceptional degree or otherwise distinguishes the case from ordinary cases in which the factor is typically present. *Id*. at 96.

Moreover, the court may not depart from the applicable guideline range based on the defendant's acceptance of responsibility for the offense, as that is considered only under U.S.S.G. § 3E1.1. Similarly, a departure may not be based on the defendant's fulfillment of restitution obligations, except to the extent required by law or the Guidelines—i.e., unexceptional efforts to remedy the harm caused by the offense do not justify departure. See U.S.S.G. § 5K2.0(d)(2), (5). Finally, a downward departure under the voluntary disclosure provision does not apply where the Defendant's motivation for disclosure is the belief that discovery of the offense is likely or imminent. See U.S.S.G. § 5K2.16.

## **Punishment for White-Collar Criminals**

The Eleventh Circuit has said "economic and fraud-based crimes" are "more rational, cool, and calculated than sudden crimes of passion or opportunity," and thus "prime candidate[s] for general deterrence." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (citing Stephanos Bibas, *White-Collar Plea Bargaining and Sentencing After Booker*, 47 Wm. & Mary L.Rev. 721, 724 (2005)). Indeed, the legislative history of Section 3553 shows Congress recognized "the critical deterrent value of imprisoning serious white-collar criminals, even where those criminals might themselves be unlikely to commit another offense[.]" *Martin*, 455 F.3d at 1240 (citing S. Rep. No. 98-225, at 76, 91-92 (1983)). The Eleventh Circuit also observed that

"[d]efendants in white collar crimes **often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment**." *Martin*, 455 F.3d at 1240 (emphasis added).

    A.    **The nature and circumstances of the offenses. <u>See</u> 18 U.S.C. § 3553(a)(1).**

As stated above, and in ([ECF No. 43]), Rebollido ran a five-year-long *Ponzi* scheme raising approximately $36 million dollars in victim funds. Rebollido first reported the scheme to law enforcement on February 1, 2024, after he grew concerned that the FBI was already investigating his company. At that time, Rebollido told law enforcement that E Card Merchant was a loan lending business located in Florida that he had been operating for between five to six years and that he was the only employee of the company. He stated that the company primarily loaned money to small businesses or individuals that could not qualify for a normal bank loan. He further stated that shortly after he started his business, E Card Merchant, it evolved into a merchant cash advance scheme or *Ponzi* Scheme. Rebollido stated that he initially tried to secure all the collateral needed, but he was unable to do so and was therefore going to be unable to deliver the returns he promised to each investor. Rebollido stated that he had approximately 100 investors who were mostly friends and family with investments ranging from $50,000 to $2 million per person and believed that he had raised approximately $50 million.

Once law enforcement began investigating the Defendant's conduct, they determined that E Card had no legitimate clients and had issued no actual loans—findings that were corroborated during further interviews of Rebollido. The government expanded its investigation by interviewing additional employees, who confirmed that Rebollido exercised sole control over the company's bank accounts and employed staff primarily to recruit new investors and process fraudulent paperwork.

Through financial analysis, the government identified ten bank accounts belonging to Pablo Rebollido and E Card. A review of these accounts revealed that of the approximately $36 million raised from victims, about $20 million was paid back to investors or redistributed to earlier investors as Ponzi-style payments in order to perpetuate the scheme. Of the remaining $ 16 million, the government determined that approximately $1.4 million was spent on land, real estate and home expenses; approximately $2 million was used to purchase investments; approximately $583,000 was withdrawn in cash transactions; approximately $774,000 was spent on boats; approximately $521,000 was paid to credit cards; approximately $365,000 was used for hotel, travel and transportation; approximately $121,000 was used for luxury vehicles and for car expenses; more than $114,000 went toward designer clothing and high-end shopping and jewelry; and approximately $84,000 was spent on clubs, mostly adult entertainment expenses.

In the months following Rebollido's confession, the government began efforts to identify and locate assets acquired with the proceeds of the fraud. While some assets were disclosed by Rebollido, others were uncovered only through a detailed analysis of both E Card's and Rebollido's personal bank accounts. As additional assets came to light, the government re-interviewed Rebollido in a process best described as progressive disclosure.

One such asset was a $500,000 54-foot yacht named *The Nelia*, which was ultimately seized by the government. The yacht was initially disclosed during a meeting with the Defendant in early 2024. At that time, the Defendant claimed he had sold the vessel. He later revealed, however, that he had only received a partial payment from a potential buyer and had abandoned the boat at a local marina. The government was then required to take substantial steps to locate the vessel, recover the keys, and initiate forfeiture proceedings.

Another example involved a 2018 Lincoln Navigator, which the government learned about only after its initial interview with the Defendant. The Defendant abandoned the vehicle, and it was eventually towed and sold at auction shortly before the government was able to seize it.

Additionally, the government identified multiple personal bank accounts belonging to Rebollido through its own financial investigation. From these accounts, agents, analysts, and attorneys discovered the existence of real property that the Defendant had sold after his original meetings with the government.

In all, this process allowed the government to recover approximately $170,000 as well assets like the real property mentioned above. Thus, while the Defendant demonstrated a degree of cooperation, the government's asset recovery efforts were significantly hindered by his lack of fulsome and timely disclosure, ultimately complicating or limiting the scope of potential seizures.

All of the above underscores the deplorable nature and circumstances of the Defendant's conduct. However, the most compelling evidence of the seriousness of this offense lies in its devastating impact on the victims. As reflected in their victim impact statements, the victims experienced significant emotional, financial, and personal harm as a result of the Defendant's fraud. In light of the scale of the offense, the Defendant's pattern of deception, and the enduring harm to the victims, a sentence of 200 months' imprisonment is both appropriate and necessary to reflect the seriousness of the offense, promote respect for the law, and provide just punishment under 18 U.S.C. § 3553(a).

**B. The history and characteristics of the Defendant. See 18 U.S.C. § 3553(a)(1).**

While the Defendant has no prior criminal history, the Court should note that the Sentencing Guidelines do not authorize special sentencing discounts based on a defendant's economic or social status**.** As the Eleventh Circuit has made clear, "[b]usiness criminals are not to

6

be treated more leniently than members of the 'criminal class' just by virtue of being regularly employed or otherwise productively engaged in lawful economic activity." *United States v. Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013). Indeed, "[c]riminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime." *Id.* at 1329–30 (quoting *United States v. Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999)).

Moreover, the Defendant's lack of criminal history is already accounted for in his Criminal History Category I, which resulted in a lower guideline range than would apply if he had a prior record. Courts in this Circuit have consistently rejected the notion that a lack of prior convictions warrants further downward variance or departure. See *United States v. Howard*, 28 F.4th 180, 223 (11th Cir. 2022); see also *United States v. Martin*, 455 F.3d 1227, 1239 (11th Cir. 2006) ("While the district court emphasized [the defendant]'s lack of a criminal record and viewed his fraudulent conduct as an 'aberration' in his otherwise outstanding life, [the defendant]'s criminal history category of I already takes into account his lack of a criminal record."). Thus, while the Defendant's lack of criminal history is not irrelevant, the Court should not give this factor more weight than the guidelines already provide, nor should it view it as a compelling basis for leniency in this case.

      **C.**    **The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; general deterrence; and specific deterrence. <u>See</u> 18 U.S.C. § 3553(a)(2)(A), (B), (C).**

The Eleventh Circuit has explicitly emphasized the significance of "general deterrence . . . in white-collar cases, where the motivation is greed." *United States v. Hayes*, 762 F.3d 1300, 1308-09 (11th Cir. 2014); *see also, e.g.*, *United States v. Kuhlman*, 711 F.3d 1321, 1328–29 (11th Cir. 2013) (vacating, as substantively unreasonable, sentence of time served, which represented a

7

57-month downward variance, for defendant responsible for $3 million health care fraud scheme, noting that "[s]uch a sentence fails to achieve an important goal of sentencing in a white-collar crime prosecution: the need for general deterrence," and that "[w]e are hard-pressed to see how a non-custodial sentence serves the goal of general deterrence."), *cert. denied*, 134 S. Ct. 140, 187 L. Ed. 2d 38 (2013). Although Rebollido has no criminal history, estimates suggest that more than seventy percent of fraud offenders, which includes the vast majority of white-collar offenders, have little or no criminal history. *See* Selected Sentencing, Guideline Application, and Demographic Information for § 2B1.1 Offenders, Fiscal Year 2012, U.S. SENT'G COMM'N (Sept. 18, 2013).

This suggests a particular need to deter those in the community who lead otherwise law-abiding lives, but, like Rebollido, chose to commit fraud for years, without getting caught. Moreover, courts have also found that, in the context of white-collar crime, positive employment history in the banking industry is no mitigating factor, particularly where, as here, the employment history enabled and/or served as the vehicle for the offenses of conviction. *See, e.g.*, *United States v. Whitehead*, 559 F.3d 918, 921 (9th Cir. 2009) (Gould, K., dissenting from denial of rehearing *en banc*) ("We can hardly be surprised if a white-collar criminal has a good employment history – otherwise, he or she would likely not be in a position to commit the crime.").

A long sentence in this case will send a strong message, not only to the victims of this offense, but to the many would-be *Ponzi* schemers who intend to use South Florida as a base of operations.

### D. The need to avoid unwarranted disparities with similarly situated offenders:

A guidelines sentence is necessary to avoid unwarranted disparities with defendants who have committed crimes of similar scope. The Government respectfully requests the Court to consider:

- *United States v. Robert Shapiro*, No. 19-CR-20178-ALTONAGA (S.D. FL. 2019) (sentencing defendant to 20 years imprisonment for defrauding thousands of victims in *Ponzi* scheme, and an additional consecutive 5 years' imprisonment for tax evasion).

- *United States v. Edwin Fujinaga*, No. 2:15-cr-00198-GMN-NJK (D. Nev. June 17, 2019) (D.E. 338) (following trial, sentencing defendant to 50 years' imprisonment for his role in spearheading a fraud and $1.12 billion *Ponzi* scheme, which involved approximately 10,000 Japanese victims).

- *United States v. Norman Schmidt*, 594 F.3d 1270, 1272 (10th Cir. 2010) (sentence of 330 months for defendant who orchestrated *Ponzi* scheme with investor losses of approximately $40 million deemed reasonable; defendant was sentenced post-trial).

- *United States v. Arthur Lamar Adams*, No. 3:18-cr-00088-CWR-LRA (S.D. Miss. Nov. 8, 2018) (D.E. 21) (sentencing organizer and leader of approximately $165 million Ponzi scheme, involving approximately 200-300 investor victims, to 27 years' (325 months' imprisonment) following entry of guilty plea).

- *United States v. Kevin Merrill*, No. 1:18-cr-00465-RDB-1 (D. Md. Oct. 11, 2019) (D.E. 146) (sentencing organizer/leader of estimated $396 million *Ponzi* and fraud scheme to 22 years' (240 months') imprisonment, following entry of plea agreement; defendant's wife was also involved, and unlike here, she was also charged and convicted).

- *United States v. Antonio Carlos De Godoy Buzaneli*, No. 0:17-cr-00284-MJD-HB (D. Minn. Apr. 10, 2019) (D.E. 132) (following guilty plea, sentencing defendant, who was also a South Florida man, and who spearheaded an approximately $150 million *Ponzi* and investment fraud scheme involving Brazilian factoring, to 20 years' (240 months') imprisonment, and to pay restitution of approximately $51 million).

- *United States v. Raymond Montoya*, No. 18-10225-GAO (D. Mass. Mar. 25, 2019) (D.E. 44-46) (sentencing defendant who spearheaded $38 million Ponzi scheme to 175 months' imprisonment following guilty plea, where guidelines range was 210-262 months).

- *United States v. Lee Loomis*, No. 12-cr-00315-JAM (E.D. Cal. Oct. 5, 2018) (D.E. 699) (following guilty plea, sentencing defendant who spearheaded approximately $10 million *Ponzi* scheme to 12 years' (144 months') imprisonment, in case involving approximately 183 investor victims).

In formulating its sentencing recommendation, the United States has also considered sentences imposed in the following white collar cases in this District, some of which involved less serious conduct, in terms of duration and victim impact, as compared to the conduct at issue here:

- *United States v. Leonard Bogdan*, No. 05-14090-CR-Martinez (S.D. Fla.) (sentence of 360 months involving investment fraud with approximately 191 victims and loss of approximately $11.5 million).

- *United States v. Darryl Burke*, No. 13-20616-CR-Cohn (S.D. Fla.) (sentence of 360 months in connection with bank fraud involving more than $7 million in losses for numerous fraudulent mortgages).

- *United States v. Domenico Rabuffo*, No. 14-20008-CR-Moore (S.D. Fla.) (sentence of 327 months in connection with bank fraud involving more than $27 million in losses for numerous fraudulent mortgages and approximately 50 victims).

- *United States v. Monte Grow*, No. 16-CR-20893-FAM (S.D. Fla.) (sentence of 262 months for pharmacy fraud involving $39 million loss to Medicare).

- *United States v. Serge Francois*, No. 16-20399-CR-Gayles (S.D. Fla.) (sentence of 204 months for owner of pharmacy involving $30 million fraud loss).

- *United States v. Jose Carlos Morales*, No. 12-20644-CR-Lenard (S.D. Fla.) (sentence of 144 months for owner of pharmacy who pleaded guilty to health care fraud involving a loss of $23 million).

- *United States v. Scott Rothstein*, No. 09-60331-CR-Cohn (S.D. Fla.) (imposing post-plea (and post-cooperation) sentence of 600 months for wealthy attorney who orchestrated $1.2 billion Ponzi scheme involving bogus settlement agreements for over four years).

- *United States v. Raoul Doekhie, et al.*, No. 18-20919-CR-Altman (S.D. Fla.) (imposing post-trial sentence of 220 months on three business partners who cheated U.S. manufacturers out of infant formula, eye-care products, and other FDA-regulated items worth more than $100 million).

- *United States v. Sanjay Singh*, No. 23-60117-CR-Leibowitz (S.D. Fla) (imposing a post-trial sentence of 276 months on the Defendant for running a 5-year Ponzi scheme where he raised over $150 million dollars from investors based on a failing over-the-road trucking operation causing an actual loss of over $50 million.)

Here, as reflected in the Presentence Investigation Report (PSI) and victim impact questionnaires, the victims were diverse in background and circumstances. Many were unsophisticated in financial matters, and far from exceedingly wealthy. Several invested their life savings or last remaining funds in what they believed to be a legitimate opportunity. A sentence of 200 months is consistent with sentences imposed in comparable cases and is necessary to avoid unwarranted sentencing disparities among similarly situated defendants, in accordance with 18 U.S.C. § 3553(a)(6).

### E. The Defendant's request for downward variance and/or departure are unwarranted.

The Defendant argues that a variance and/or departure is warranted for three reasons: (1) his review of sentencing statistics on the Judiciary Sentencing Information (JSIN) platform supports a lower sentence; (2) he exhibited extraordinary acceptance of responsibility; and (3) he voluntarily disclosed the offense. The government disagrees. First, the Defendant has failed to demonstrate that the cases cited from JSIN are sufficiently analogous to his own in terms of offense conduct, victim impact, and role in the scheme. Second, acceptance of responsibility is not a valid basis for departure under U.S.S.G. § 5K2.0(d)(2), and in any event, the Defendant's acceptance was not extraordinary. Finally, the Defendant does not qualify for a departure based on voluntary disclosure under U.S.S.G. § 5K2.16, as he only came forward after he believed he was under investigation.

The Defendant argues that data from the Judiciary Sentencing Information (JSIN) platform supports a downward variance. Specifically, he notes that during the last five fiscal years (FY 2020–2024), there were 30 defendants whose primary guideline was U.S.S.G. § 2B1.1, with a Final Offense Level of 36 and a Criminal History Category I, excluding those who received a departure under § 5K1.1 for substantial assistance. He further contends that for those 30 defendants, 100%

11

of whom received a sentence of imprisonment, the average and median term of imprisonment was 120 months. Based on this statistical comparison, the Defendant appears to be indirectly requesting a downward variance from the bottom of the applicable guideline range of 188 months to 120 months.

However, the JSIN data cited by the Defendant fails to account for the specific offense characteristics and aggravating factors present in this case. For example, the statistics do not distinguish between cases involving corporate or government victims and those, like this one, involving individual laypersons, many of whom were financially unsophisticated. The data also does not account for the number of victims, the severity of the financial harm, or the devastating personal impact the fraud had on them.

Most importantly, the JSIN platform can not capture the nature and scope of the Defendant's deceit. Here, Rebollido engaged in brazen, face-to-face fraud, often targeting friends, family members, or their associates. He looked victims directly in the eye and lied about the existence and success of a business he knew had no clients and no revenue. The nature of these lies, deeply personal and deliberate, represent some of the most egregious forms of deceit.

The sentencing data relied upon by the Defendant simply cannot reflect those facts, nor can it capture the intangible but significant factors that often influence a court's decision to deny a variance or departure. As such, the Defendant's reliance on that data is unpersuasive and insufficient to justify a downward variance

Next, the Defendant claims that he is entitled to a variance and/or departure based on extraordinary acceptance of responsibility, citing his decision to turn himself in and disclose assets for forfeiture. However, the Court may not depart from the applicable guideline range based on a defendant's acceptance of responsibility, which is already accounted for under U.S.S.G. § 3E1.1.

Nor may the Court depart based on a defendant's fulfillment of restitution obligations except to the extent required by law, and only when such efforts are exceptional. See U.S.S.G. § 5K2.0(d)(2), (5). The Guidelines make clear that unexceptional efforts to remedy harm, such as fulfilling legal obligations or cooperating with asset forfeiture, do not warrant a departure.

The Defendant cites several cases in support of his claim that extraordinary acceptance of responsibility may justify a downward departure. However, none of the cases cited arise from the Eleventh Circuit and therefore carry limited persuasive weight. Moreover, the Defendant argues that his conduct is extraordinary because he alerted authorities to his offense and voluntarily paid restitution. The government first addresses the Defendant's request for a departure based on payment of restitution.

The Defendant claims he advised the government of all his bank accounts and cooperated with the forfeiture of those funds, provided they would be returned to victims. However, the Defendant did not make restitution through affirmative cash payments, but merely agreed to the seizure of remaining bank accounts and fraud proceeds already traceable by the government. These proceeds represent only a small fraction of the total restitution owed. Restitution has not been satisfied, and therefore the Defendant's actions can not reasonably be deemed "extraordinary."

Moreover, the Defendant's cooperation with asset recovery was not immediate or complete. As discussed previously, his disclosures were made progressively, over the course of multiple meetings, and only after substantial investigative efforts by the government. This conduct falls far short of the type of "exceptional" restitution effort contemplated by the guidelines and does not support a variance or departure on this basis.

Finally, addressing the issue of voluntary disclosure, U.S.S.G. § 5K2.16 provides:

> If the defendant voluntarily discloses to authorities the existence of, and accepts responsibility for, the offense prior to the discovery of such offense, and if such offense

> was unlikely to have been discovered otherwise, a downward departure may be warranted. For example, a downward departure under this section might be considered where a defendant, *motivated by remorse*, discloses an offense that otherwise would have remained undiscovered. *This provision does not apply where the motivating factor is the defendant's knowledge that discovery of the offense is likely or imminent*, or where the defendant's disclosure occurs in connection with the investigation or prosecution of the defendant for related conduct. (emphasis added)

Courts interpreting this guideline have made clear that a departure under § 5K2.16 is appropriate only when the defendant is motivated by guilt or remorse and the government receives information it likely would not have otherwise obtained. See *United States v. Besler*, 86 F.3d 745, 746–47 (7th Cir. 1996) (holding that a downward departure is warranted only where disclosure is made prior to likely discovery, and the offense would otherwise have remained hidden).

The Defendant cites *United States v. Brownstein*, 79 F.3d 121 (9th Cir. 1996), for the proposition that § 5K2.16 sets forth two distinct requirements: (1) the defendant voluntarily disclosed the offense and accepted responsibility prior to its discovery, and (2) the offense was unlikely to have been discovered otherwise. See also *United States v. Adams*, 996 F.2d 75, 79 (5th Cir. 1993) (noting in dicta that the guideline applies only where the offense likely would have remained undiscovered). The policy statement itself gives as an example a defendant who, "motivated by remorse, discloses an offense that otherwise would have remained undiscovered." *Brownstein*, 79 F.3d at 123.

In what amounts to a cursory analysis, the Defendant argues that he meets the two requirements for a downward departure under § 5K2.16. The Government disagrees. That standard is not met here. By the Defendant's own admission, when he turned himself in on February 1, 2024, he was motivated, at least in part, by his belief that the Government was already investigating him. This admission is fatal to his argument. A disclosure motivated by fear of imminent discovery, rather than by genuine guilt or remorse, fails to satisfy either prong of § 5K2.16. Moreover, the

14

Defendant's Ponzi scheme was running out of funds to make the requisite payments, and at least one investor had demanded money back. This undermines any claim that the offense was unlikely to be discovered. Accordingly, the Defendant is not entitled to a downward departure or variance based on voluntary disclosure, and his request should be denied.

## **CONCLUSION**

For the foregoing reasons, the Court should The Court should deny Defendant's motion for a downward variance and/or departure and impose Guidelines sentence of 200 months to recognize the damage inflicted by his fraud; and to accomplish the goals of sentencing set forth in 18 U.S.C. § 3553.

Respectfully submitted,

JASON REDING QUIÑONES
UNITED STATES ATTORNEY

By:   */s/ Robert F. Moore*
Robert F. Moore
Assistant United States Attorney
Court Id No. A5502488
United States Attorney's Office
99 NE 4th Street
Miami, Florida 33132
Tel: (305) 961-9411
Email: Robert.Moore@usdoj.gov

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

By: */s/ Robert F. Moore*
Robert F. Moore